giving effect to the determinations reached herein.

In re Marvin Jerry **FINE**, Debtor.

**DOUGLAS COUNTY BANK, Plaintiff,**

v.

**Marvin Jerry FINE, Defendant.**

Bankruptcy No. 87–20092–7.
Adv. No. 87–0209.

United States Bankruptcy Court,
D. Kansas.

July 26, 1988.

James S. Willis, Kansas City, Kan., for debtor/defendant.

Charles T. Engel and Bruce J. Woner, of Cosgrove, Webb & Oman, Topeka, Kan., for plaintiff.

Eric C. Rajala, Overland Park, Kan., Trustee.

## MEMORANDUM OPINION AND ORDER

BENJAMIN E. FRANKLIN,
Bankruptcy Judge.

This matter came for trial on February 29 and March 1, 1988, on the complaint of Douglas County Bank objecting to the discharge of Marvin Jerry Fine under section 727(a)(2)(A) of Title 11, United States Code. The plaintiff/bank appeared through counsel, Charles T. Engel and Bruce J. Woner. The defendant/debtor, Marvin Jerry Fine, appeared through counsel, James S. Willis.

### FINDINGS OF FACT

Based upon stipulations of the parties, the testimony at trial, the exhibits, and the record, this Court finds as follows:

1. Douglas County Bank, the plaintiff, is a banking corporation organized and existing under the laws of the State of Kansas with its principal place of business at Ninth and Kentucky Streets, Lawrence, Kansas.

2. On July 21, 1986, the debtor executed and delivered to the plaintiff a promissory note in the principal amount of $25,000 with interest at the rate of 10.99% per annum. On the date of filing his petition (January 26, 1987), the debtor's balance due and owing Douglas County Bank was $20,-765.29. The debtor's note to the plaintiff is unsecured.

3. Marvin Jerry Fine, the debtor, is a 52–year–old tenured professor in the Department of Educational Psychology and Research at the University of Kansas in Lawrence. The debtor receives approxi-

mately $40,000 per year compensation from the University of Kansas. The debtor, a licensed psychologist in Kansas, also earns between $30,000 and $35,000 annually from his private consulting practice at the Franklin County Mental Health Clinic in Ottawa, Kansas. The debtor also earns income conducting private consultations at his residence in Lawrence, Kansas. The debtor was divorced from Ruth Fine in January of 1986. On January 26, 1987, the debtor filed a petition for relief under chapter 7, Title 11 of the United States Code.

4. Fine was a part owner of three restaurants located in Lawrence, Leavenworth, and Ottawa, Kansas, known as the Harry Bear's restaurants which closed in the spring of 1986. At this point, Fine first considered the possibility of filing bankruptcy. In the fall of 1986, Columbia Savings & Loan Association, the mortgage holder on several rental properties, including the Villa Capri Apartments, in which Fine held an interest, notified Fine that his note was several months delinquent. Fine was not active in the day-to-day management of these properties. After looking into the financial condition of these various rental properties, he began to seriously consider filing bankruptcy. Fine began to make pre-bankruptcy moves including liquidating some of his assets and investments. This liquidation of assets is the subject of the present dispute.

### Transfer to Sylvia Fishbein, the Debtor's Sister

5. In June of 1980, Marvin Fine, John Suder, Gary Potts, and Sidney Harrison formed a partnership called Holiday Hills Investors to acquire ownership of a 5-acre piece of underdeveloped residential real estate in the Holiday Hills Subdivision, Lawrence, Kansas, for $32,000. Each partner contributed $2,500 towards the down payment and held a 25% interest in the partnership. Potts and Suder were associated with the debtor in business ventures other than Holiday Hills Investors. Subsequently, the debtor Fine, acquired Potts' 25% interest, and Suder acquired Harrison's 25% interest, leaving both Fine and Suder with 50% interests each.

6. On both November 4, 1985, and March 13, 1986, the debtor represented to Douglas County Bank that the value of his equity in the five acres was $27,500.

7. On February 20, 1986, Fine and Suder, as Holiday Hills Investors, entered into a contract to sell the five acres to Donna Denning for $52,500, payable as follows: $2,000 down payment; $3,250 upon approval of title; the remaining $47,250 over a 10-year period, in quarterly installments of $1,371.48, with the first payment due September 16, 1986. The Denning contract closed on August 13, 1986. Denning made the first contract payment on September 16, 1986, and remains current on all payments.

8. On two occasions, April 30, 1986 and August 28, 1986, Fine presented a handwritten statement to the Douglas County Bank that his 50% interest in the Denning contract was worth $22,000.

9. In the fall of 1986, Fine asked Suder what he would give him for his 50% interest. Suder did not make an offer. However, he responded that he would pay him $8,500. To arrive at this value, Suder used discount tables to determine the present value of an investment which yields quarterly payments over a fixed time at a fixed interest rate. Suder is a financial planner.

10. On October 27, 1986, Fine assigned his 50% interest in the Denning contract to his sister, Sylvia Fishbein, for $10,000 cash. That same day, Fine executed a quit claim deed to the five-acre property to his sister, and filed the deed with the Douglas County Register of Deeds.

### Transfer to John Poggio, Friend and Former Business Partner

11. In 1979, Marvin Fine, Gary Potts, Rob Sturgeon, John Poggio, and Douglas Glassnapp, formed Six-Pac, Inc., a Kansas corporation. Each incorporator contributed $10,000 in capital and owned 20% of the stock. The primary asset of Six-Pac, Inc. was two bars on one acre of real estate commonly known as 2406 and 2408 South Iowa Street, Lawrence, Kansas. The purchase price of the property was $208,000.

The corporation applied most of the $50,000 as a down payment and financed the rest of the price. The corporation's articles of incorporation and bylaws do not require the shareholders to offer their respective shares to the other shareholders before offering the shares to outsiders.

12. Six–Pac, Inc. operated the two bars itself during the period of 1979 to 1981. During this period, the corporation lost money and the shareholders contributed approximately $14,000 in additional capital. In 1981, the corporation leased the bars to various operators, most recently to Ken Price. Price was continually late in payment of rent, causing first Potts and then Fine to personally visit Price to collect the rent. At times Price fell so far behind on the rent that the corporation had to assess the shareholders in order to meet the monthly mortgage payments. However, Price always caught the rent up at the end of each year in order to renew his Kansas liquor license.

13. Beginning in 1981, Six–Pac listed the real estate for sale. The shareholders had initially acquired the property to sell it at some later time. Six–Pac employed the McGrew Real Estate Agency to list the property for sale. Shareholders Rob Sturgeon and Potts were employees of McGrew Real Estate at the time.

14. In August of 1981, Six–Pac received its first written offer to purchase part of the real property. George Irwin offered to purchase slightly less than one-half of the total property for $75,000. The shareholders of Six–Pac determined that the price was too low and rejected the offer.

15. On October 2, 1984, Fine acquired an additional 20% interest in Six–Pac from Gary Potts for an unknown sum. Fine then owned a 40% interest in Six–Pac.

16. On June 1, 1985, Six–Pac formally executed an agreement with McGrew Real Estate, Inc., granting the latter the exclusive right to sell the real estate for $275,000. Cory Brinkerhoff was the agent.

17. On both November 4, 1985 and March 13, 1986, Fine represented to the Bank that his 40% share of the Six–Pac equity was worth $50,000.

18. In the spring of 1986, George Laham, a realtor from Wichita, Kansas, presented the corporation with an offer to purchase the real estate for $235,000. The offer was in the nature of an exclusive option to purchase the property. Laham did not have an actual buyer and was searching for a fast food franchise to pay the price. Although the shareholders accepted the offer, the deal failed to close because Laham could not locate a franchise or obtain the necessary financing. After taking into account the outstanding $150,000 debt and a 6% commission had this sale closed, Fine's 40% equity interest would have been worth $28,360.

19. On April 30, 1986, Fine represented to the Bank that his interest in the Laham contract was possibly worth $28,000. On August 28, 1986, Fine represented to the Bank that his 40% interest in Six–Pac equity was worth $50,000.

20. John Poggio is associate dean for research and development in the University of Kansas School of Education. He has known the debtor for 18 years, having served in the same department at Kansas University. Poggio has been the debtor's supervisor since 1980. Poggio and the debtor were close social friends, professional colleagues, and partners or shareholders in South Star, Inc., a restaurant operation in Springfield, Missouri; University Investors, which operated a residential duplex; Sunset Racquets, which produced racquetball rackets; Ridgecourt Investors, which owned a vacant gasoline station in Lawrence; and Six–Pac. Poggio was well aware of the emotional strain the debtor suffered following the latter's January 1986 divorce, as well as the debtor's financial plight in the summer of 1986.

21. In September of 1986, Fine approached Sturgeon and Poggio, two of the existing shareholders in Six–Pac, and Brinkerhoff, the realtor, about selling his 40% interest. Sturgeon and Brinkerhoff were not interested.

22. Toward the end of October 1986, Fine called Poggio at the latter's home at approximately 7:00 p.m. saying, "I'm going

to sell (interest in Six Pac). What will you give me for it?" Fine further stated that he was liquidating all his holdings, and that he was facing a bankruptcy. Poggio asked when Fine needed an answer, and whether the offer was only to Poggio or to all the other shareholders. Fine responded, "I need to know right away, you don't have a week to think about this. I need a decision preferably tonight, at the latest, first thing in the morning. You all talk about it as a group." Fine testified that when he last inquired of Poggio in late October 1986, he wanted $20,000 for his interest in Six–Pac. After unsuccessful attempts to contact Sturgeon and Glasnapp, Poggio decided to offer Fine $10,000 to $12,000 for the debtor's interest in Six–Pac. At approximately 11:00 p.m. that same evening, Poggio telephoned Fine and extended the $10,000 offer, which Fine accepted. On October 28, 1986, Fine assigned his shares in Six–Pac to Poggio.

23. After acquiring Fine's 40% interest, Poggio transferred ⅓ of it for $3,333.37 each to Sturgeon and Glasnapp. Thus each of the three remaining shareholders owned ⅓ of Six–Pac.

24. In February, 1987, Six–Pac, Inc. received an offer to purchase the property from David Billings and Arvid Zarley for $260,000. These buyers were purchasing the property for the purpose of building a Ponderosa Steak House on it. This offer fell through when Ponderosa's headquarters decided that there was not sufficient parking space at this location for one of its restaurants.

25. At about the same time as the Billings–Zarley offer was received, the shareholders of Six–Pac, Inc. met a second time with George Laham, who indicated that he was interested in the property on behalf of Shoney's, Inc. Mr. Laham refused to actually present the offer from Shoney's, Inc. to Six–Pac, Inc. at this time unless the corporation agreed to pay him an additional real estate commission of $10,000 on top of the 6% commission in the McGrew Realty Company listing agreement. The shareholders unanimously agreed not to pay the additional real estate commission, so this potential offer did not materialize.

26. In July, 1987, Six–Pac, Inc. was again approached by George Laham on behalf of Shoney's, Inc. with an offer to purchase the property for $270,000. This offer was contingent on site plan approval by the Lawrence City Commission. Shoney's, Inc. had 60 days from the date of the offer to obtain site plan approval. This period was subsequently extended and site plan approval was obtained in the latter part of 1987. The closing on this offer was further delayed by the refusal of Ken Price to vacate the premises. The shareholders did not receive their net proceeds until January, 1988, and John Poggio testified that he was not sure that the sale would actually close until the last week of December, 1987. After netting out the outstanding debt and the commission, Six–Pac netted $102,369.96. The corporation distributed approximately $34,000 each to Poggio, Sturgeon and Glasnapp. Had Fine retained his interest, Fine's 40% share of the Shoney's contract proceeds would have been $40,497.98.

27. Douglas County Bank presented the testimony of an appraiser, Daniel Craig. Craig testified that the fair market value of the real estate in November of 1986 was $255,000. Based on that figure, less the outstanding indebtedness and a 6% real estate commission, Six–Pac would have realized net proceeds of $94,900, and Fine would have realized $37,960 for his 40% interest.

28. Fine did not appraise his 40% interest before selling it to Poggio for $10,000.

### Transfer to Michael Roark

29. Michael Roark is a certified public accountant in Lawrence, Kansas. Roark has known Fine for many years, having performed accounting services not only for Fine personally, but for North Star, Inc., a sub-chapter S corporation in which Fine formerly had an interest; Harry Bears, Inc.; Six–Pac, Inc.; and the Sixth Street Building Partnership. Roark knew Fine was experiencing severe financial difficulties.

30. Fine owned a 31% interest in the Sixth Street Building Partnership. Kenneth Creasey and North Star, Inc. owned 50% and 19% of the partnership respectively. The partnership owned real estate on West Sixth Street, Lawrence, Kansas, which housed the Trailways (now Greyhound) bus depot. Trailways' five-year lease terminated on December 31, 1987. The premises are now leased to Greyhound on a six-month basis.

31. On November 14, 1985, March 13, 1986, and August 28, 1986, Fine represented to the Bank that his 31% share of the equity in the Sixth Street Building Partnership was worth $18,600.

32. In late October 1986, Fine asked Roark whether he was interested in purchasing some of his assets. Specifically, Fine offered to sell Roark his 31% interest in the Sixth Street Building Partnership for $10,000 cash and the assumption of 31% of the partnership liabilities, namely two mortgages on the real estate totalling $93,-200.

33. After informally determining the value of the real estate between $115,000 and $120,000 by consulting with Creasey, the other partner, Roark countered with a $6,000 take-it-or-leave-it offer, which the debtor accepted. All negotiations between the debtor and Roark occurred within one-to-two weeks before the transaction closed on November 10, 1986, when Roark delivered his check for $6,000 and one-half the attorneys' fees. Roark testified that, at the time he purchased the debtor's interest in the Sixth Street Building Partnership, the rental payments from the bus company were less than the amount required to service his portion of the mortgages on the real estate, and that he knew he would have to contribute his own funds to make up the difference.

34. Dan Craig, the Bank's appraiser, testified that at the time of the debtor's transfer of his 31% interest in the depot to Roark, the market value of the depot was $117,000, but that he felt comfortable with a $113,000 to $120,000 range.

35. On July 10, 1987, approximately seven months after the sale, the partner-ship had the property appraised by Eugene Hardtarfer, a real estate appraiser from Lawrence, Kansas. Hardtarfer appraised the property only at $91,500.

*Transfer to Michael Fine*

36. Michael Fine of Lawrence, Kansas, is Marvin Fine's adult son.

37. On December 6, 1986, Fine executed a warranty deed dated January 6, 1986, eleven months earlier, transferring 10% of Fine's interest in the real estate commonly known as 19 West 14th Street, Lawrence, Kansas, to his son. The deed was filed for record with the Douglas County Register of Deeds on February 20, 1987, approximately one month after Fine filed his bankruptcy petition. On December 19, 1986, Fine again executed a warranty deed dated January 6, 1986, transferring the same interest in the 14th Street real estate to his son. The deed was filed for record with the Douglas County Register of Deeds on December 24, 1986, a month prior to the debtor's petition.

38. Fine testified that the consideration for transferring 10% of his interest in the 14th Street real estate was compensation for damages his son suffered after heeding his father's advice to contribute $7,500 to an investment which turned sour. Marvin Fine advised his son, Michael, to invest in Valu–Com of Lawrence, Inc. in the fall of 1985. Marvin Fine believed that this was a sound investment and would be profitable for both his son and himself. Valu–Com was in the business of selling long distance phone service. Michael Fine borrowed $7,500 from Douglas County Bank to invest in Valu–Com and Marvin Fine co-signed the promissory note evidencing this debt. Marvin Fine invested $20,000 of his own funds in Valu–Com. The company operated for only a very short period of time before it became defunct in late 1985. Both Fines lost all of the money they had invested in Valu–Com.

39. Fine testified that immediately after Valu–Com ceased operations in late 1985, he informed Michael Fine that he felt an obligation to reimburse him for the $7,500

loss he incurred when he invested in Valu-Com upon his father's advice. Marvin Fine did not have cash with which to pay his son $7,500 at this time. He did own 61% of an apartment building at 19 West 14th Street, Lawrence, Kansas. His ex-wife, Ruth Fine, held the other 39% pursuant to the terms of the parties' divorce decree entered in January, 1986. Fine testified that he orally transferred a 10% interest to Michael Fine in this property, thereby reducing his interest in this building to 51%. At the time, Fine forgot to have a deed prepared effectuating this transfer and he did not remember to do this until December of 1986. At that time, he met with George Catt, an attorney in Lawrence, who prepared the warranty deed conveying 10% interest in this property to Michael Fine. The first deed was filed with the Douglas County Register of Deeds on December 24, 1986. Due to an error in the legal description of the property in this warranty deed, it was necessary for Fine to execute a second warranty deed in late December, 1986, which he left with Mr. Catt for filing. This deed was not recorded until February 20, 1987, approximately one month after the debtor filed his chapter 7 petition.

40. Fine's version of circumstances surrounding the transfer is supported by the fact that he did present Douglas County Bank with a financial statement on August 28, 1986, showing that he held only a 51% interest in the 19th Street property, thereby reflecting the transfer of the 10% interest to his son. His March 3, 1986 financial statement reflected that he held a 61% interest in this property and Fine testified that this was an oversight on his part due to the fact that he had copied this from a previous financial statement.

41. Fine testified that he considered the 14th Street real estate to be worth approximately $20,000 above the outstanding indebtedness on the property. Therefore, the value of the 10% interest transfer to his son was worth around $2,000.

42. On December 24, 1986, Fine paid Michael Fine $1,500 cash, which he alleges was reimbursement for his son's services in the summer of 1986, those services includ-ed moving Fine into his current residence at 1707 University Drive, Lawrence, Kansas, and performing landscaping, remodeling, and electrical work on the residence, most of which were completed by September 1986. Both Fine and his son testified that Michael Fine spent 70 to 80 hours performing the services for which the debtor paid his son $1,500. Michael Fine took no security interest in property of the debtor to secure payment for his services.

### Transfer to Katherine Wardle

43. Katherine Wardle, a single woman, is a close friend of the debtor and resides in Lathom, New York. The debtor testified that he and Wardle see each other twice a month. The debtor has known Wardle for nine years, having met her at a professional conference.

44. On January 12, 1987, less than two weeks prior to filing his bankruptcy petition, Fine executed and delivered in favor of Wardle a promissory note in the amount of $10,000 together with interest at the rate of 8% per annum due on or before December 31, 1987. To secure his note to Wardle, Fine assigned to her his 1986 personal Kansas and federal income tax refunds. He estimated his refunds totalled $12,000. Wardle perfected her security interest in the refunds by filing a UCC–1 statement with the Kansas Secretary of State on January 26, 1987, the date the debtor filed for bankruptcy.

45. Fine testified that he only received 1986 income tax refunds totaling $8,500 which he transferred to Wardle.

### Application of the Proceeds from the Above Transfers To Exempt Property and the Subsequent Filing of the Bankruptcy

46. Fine testified that he applied the $36,000 of proceeds from the transfers to Fishbein, Wardle, Roark, and Poggio toward improvements at his residence, reduction of his home mortgage balance, and the purchase of a new automobile.

47. On January 26, 1987, Fine filed a petition for relief under chapter 7 of Title 11, United States Code.

48. The debtor filed two statements of financial affairs on March 9, 1987. The first statement reviewed the financial affairs of a debtor not engaged in business. The second statement recounted the financial affairs of a debtor engaged in business. The debtor executed both statements of affairs under oath. Question No. 12(b) on the statement of a debtor not engaged in business and Question No. 14(b) on the statement of a debtor engaged in business request the same information, as follows:

*Transfers of Property.* (b) Have you made any other transfer, absolute or for the purpose of security, or any other disposition of real or personal property which was not in the ordinary course of business during the year immediately preceding the filing of the original petition herein?

In response, the debtor gave the following answer to both questions:

1964 Volkswagon sold to daughter for $500; 1980 Dodge Omni sold to daughter for $700; transferred interest in 1986 income tax refund to Katherine Wardle for loan of $10,000 on funds then paid to Columbia Savings home mortgage; sold interest in bus deposit (sic) to Michael Roarke (sic) in December 1986 for $6,500; sold vacant lot to John McGrew for $17,-000 in May or June, 1986, proceeds used to purchase home; sold tract of land to sister, Sylvia Fishbein, in November, 1986 for $70,000; and sold interest in two bars to John Poggio in December, 1986 for $10,000.

### ISSUE OF LAW

Whether the Debtor's Transfers to Michael Roark, John Poggio, Sylvia Fishbein, Katherine Wardle, and Michael Fine Violated 11 U.S.C. § 727(a)(2)(A).

### CONCLUSIONS OF LAW

Under section 727(a)(2)(A), this Court will grant the debtor a discharge unless:

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition;

The purpose of section 727(a)(2)(A) is to deny a discharge to those debtors who, intending to defraud, transfer without consideration property which would have become property of the estate. *In re Butler,* 38 B.R. 884, 887 (Bankr.D.Kan.1984).

The statute requires four elements be proven: (1) a transfer of property occurred; (2) the property was property of the debtor; (3) the transfer occurred within one year of the filing of the petition; and (4) the debtor had, at the time of the transfer, intent to hinder, delay or defraud a creditor. *Id.* Under Bankruptcy Rule 4003, the plaintiff has the burden of proving the objection at the trial on a complaint objecting to discharge.

There is no dispute as to the first three elements. On October 27, 1986, the debtor transferred to Sylvia Fishbein, his sister, his interest in the Holiday Hills–Denning contract, for $10,000. On October 28, 1986, the debtor transferred to John Poggio, a business associate, his 40% interest in the Six–Pac, Inc. real estate located at 2406 and 2408 Iowa, Lawrence, Kansas, for $10,-000. On November 10, 1986, the debtor transferred to Michael Roark, his accountant, his 31% interest in the Sixth Street Building Partnership for $6,000. On December 6, 1986, the debtor executed a warranty deed to Michael Fine, his son, transferring a 10% interest in real estate at 19 West 14th Street, Lawrence, Kansas. On December 19, 1986, the debtor executed a second warranty deed to his son of the same 10% interest in the real estate at 19 West 14th Street. On December 24, 1986, the debtor transferred $1,500 to his son. On January 12, 1987, the debtor borrowed $10,000 from Katherine Wardle, his friend and associate, and assigned to her his 1986 income tax refunds as security. On January 16, 1987, the debtor filed for bankruptcy. All these transfers were of property of the debtor and occurred within one year of

the filing of the petition. The only question that remains is whether the debtor had, at the time of the transfer, intent to hinder, delay or defraud a creditor.

The debtor asserts that "these transfers are permitted under Kansas law and that they were not made with the intent to hinder, delay, or defraud his creditors, but were made to protect and improve his homestead so that he could obtain the 'fresh start' which is the cornerstone of the Bankruptcy Code." In other words, the debtor asserts that these transfers amount to merely pre-bankruptcy planning by converting non-exempt assets into exempt assets.

The right to convert non-exempt assets into exempt assets is well settled in Kansas. *See Metz v. Williams*, 149 Kan. 647, 88 P.2d 1093 (1930); *McConnell v. Wolcott*, 70 Kan. 375, 78 P. 848 (1904). This is also the general rule elsewhere. *See In re Reed*, 700 F.2d 986, 990 (5th Cir.1983). As such, the mere fact that the debtor converted non-exempt property to exempt property on the eve of bankruptcy is insufficient to support a finding of fraudulent intent, per se. *See In re Bourland*, No. 83–40161 (Bankr.D.Kan. Oct. 7, 1986) (Pusateri, J.) [available on WESTLAW, 1986 WL 20914]; and *In re Barash*, 69 B.R. 231 (Bankr.D. Kan.1984) (Pusateri, J.). The legislative history of the Bankruptcy Code establishes that Congress intended to allow debtors to make full use of statutory exemptions by permitting debtors to convert non-exempt property into exempt property before bankruptcy:

> As under current law, the debtor will be permitted to convert nonexempt property into exempt property before filing a bankruptcy petition. The practice is not fraudulent as to creditors and permits the debtor to make full use of the exemptions to which he is entitled under law.

H.R.Rep. No. 595, 95th Cong., 2d Sess. 361 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 76 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5862, 6317.

However, if the plaintiff can prove that the debtor converted non-exempt assets to exempt assets with the actual intent to hinder, delay, or defraud a creditor, the conversion is objectionable and may provide a basis for denying a discharge under section 727(a)(2)(A). *See Bourland*, slip. op. at 5. *Barash*, 69 B.R. at 233; and 4 Collier on Bankruptcy ¶ 727.02[3][a] (15th ed. 1988). In other words, although the mere conversion on the eve of bankruptcy alone is not sufficient to deny a discharge, if the conversion is accompanied by some extrinsic evidence establishing an intent to hinder, delay, or defraud a creditor, then the discharge may be denied. *See In re Tveten*, 70 B.R. 529, 533 (Bankr.D.Minn. 1987); and *In re White*, 28 B.R. 240 (Bankr.E.D.Va.1983).

To determine whether the debtor converted non-exempt assets to exempt assets with the intent to hinder, delay, or defraud a creditor, courts rely on so-called "badges" or "indicia" of fraud, such as: (1) the objecting creditor had a "special equity" in the non-exempt property which is converted into exempt property; (2) the debtor and the transferee enjoyed a family, friendship, or close associate relationship; (3) the debtor retained the possession, benefit, or use of the property in question; (4) the debtor engaged in a sharp pattern of dealing immediately before bankruptcy; (5) the debtor became insolvent as a result of the transfers (financial condition); (6) the conversion occurred after the entry of a large judgment against the debtor; (7) the debtor received inadequate consideration. *See* Collier on Bankruptcy, *supra*. While not every circumstance need be shown, there must be sufficient indicia to rise to the level of clear and convincing evidence that the debtor intended to hinder, delay, or defraud creditors.

Certainly in Kansas, if the objecting creditor had a "special equity" in the non-exempt assets which are converted into exempt property, then fraudulent intent may exist. *See Exchange State Bank v. Poindexter*, 137 Kan. 101, 19 P.2d 705 (1933); and *Long Brothers v. Murphy*, 27 Kan. 375 (1892). In the present case, the Court finds that the plaintiff Bank failed to show it had any interest in the non-exempt assets such that it had liens or that it supplied funds on the actual non-exempt property. The Bank

did not present any evidence that the debtor obtained credit as a means of acquiring the exempt property.

Furthermore, the plaintiff failed to present any evidence on the following indicia: that the debtor became insolvent as a result of the transfers; that the debtor engaged in a sharp pattern of dealing with creditors immediately prior to bankruptcy; that the debtor converted the assets only after a large judgment was entered against him; or that the debtor retained possession, benefit, or use of the transferred property. On the contrary, a review of the debtor's bankruptcy schedules indicates that Fine's debts far exceeded his assets long prior to the transfers. Fine scheduled debts totalling $1,384,482.51. Fine was insolvent and in financial straits for a considerable period prior to the transfers and his bankruptcy.

Admittedly, the plaintiff proved that the debtor enjoyed either a family, friendship, or close associate relationship with each of his transferees. Sylvia Fishbein is the debtor's sister. Michael Fine is the debtor's son. Michael Roark is the debtor's personal accountant. Roark also did the books for many of the business endeavors which the plaintiff held an interest. John Poggio is the debtor's superior at the University of Kansas, close friend, professional colleague, and co-investor in several business endeavors. Katherine Wardle is a professional colleague as well a part-time companion of the debtor. Furthermore, all the transferees knew of the debtor's dire financial condition at the time of the transfers.

However, this Court cannot find that the mere fact that the debtor transferred property to family, friends, or close associates, in and of itself, constitutes an intent to hinder, delay, or defraud creditors. Most of the reported cases involving objections to discharge based on transfers of assets to family, friends, or close associates, also involve another indicia of fraud: *gratuitous* transfers or lack of adequate consideration. *See*, e.g. *In re Adeeb*, 787 F.2d 1339 (9th Cir.1986); *In re Butler*, 38 B.R. 884 (Bankr.D.Kan.1984); *In re Loeber*, 12 B.R. 669 (Bankr.D.N.J.1981); and *In re Ramos*, 8 B.R. 490 (Bankr.W.D.Wis.1981). Certainly transfers to relatives, friends, and associates must be subject to close scrutiny to determine if the debtor is putting up a facade to protect his assets for the future. *See Loeber*, 12 B.R. at 675. However, if the family members, friends, or close associates actually paid fair and adequate consideration, then the mere fact of the relationship alone does not carry much weight in finding fraudulent intent. As such, this leaves inadequacy of consideration as the most significant "badge" or "indicia" of fraud in this case. The Court must analyze each transaction separately.

The Court finds that the debtor received adequate consideration from Sylvia Fishbein for his 50% interest in Holiday Hills Investors' contract with Donna Denning. Fine received $10,000. John Suder, a financial planner and the other 50% interest owner, testified that the present value of the property was only around $8,500. This Court found Suder's testimony credible.

This Court further finds that the debtor also received adequate consideration (at the time) from John Poggio for his 40% of Six–Pac, Inc. under all the circumstances. Fine received $10,000. This was a close call because if Fine had waited until the corporation sold the real estate on Iowa Street for $270,000, he would have received four times that amount. However, hindsight is always 20–20. This Court can only look to see if Fine received adequate consideration *at the time he actually transferred* the property on October 28, 1986. At that time, several factors severely depressed the price Fine could reasonably hope to obtain for his 40% interest in the property. The first factor was the very limited pool of potential buyers Fine could sell to. Fine was only a minority shareholder of a very small corporation, and was not selling the real estate outright. Realistically, the only other potential buyers were the other shareholders: Poggio, Rob Sturgeon, and Doug Glassnapp. Glassnap and Sturgeon were not interested. That left Poggio. Another factor was the tremendous risk that any potential investor would incur in purchasing the interest.

This was not an attractive investment. Poggio's actions bear this point out. After purchasing the 40% interest, he immediately divided it up among the other shareholders to minimize his risk. Furthermore, the corporation had $150,000 outstanding debt on the real estate. The corporation had tried to sell the property for six years to no avail. During that six-year period, the corporation had a lot of difficulty collecting rental income to cover the mortgage payments. As such, this Court finds that at the time Fine transferred his interest to Poggio for $10,000, he received adequate consideration under all the circumstances.

This Court further finds that Fine clearly received adequate consideration from Michael Roark for his 31% interest in the Sixth Street Building Partnership. Fine received $6,000. All the evidence at trial, including a couple of appraisals, indicated that $6,000 was more than fair market value.

This Court further finds that Fine clearly received adequate consideration from Katherine Wardle for his 1986 income tax refunds. Fine borrowed $10,000 from Wardle and assigned his potential refund to her as security. As it turned out, the refunds were only worth $8,500.

This leaves the two transfers to his son, Michael, of $1,500 cash and of the 10% interest in the 14th Street real estate. The facts surrounding these transfers are different from the rest because the transfers were not in the nature of pre-bankruptcy planning. The debtor did not receive any consideration as such at the time of the transfer to convert into exempt assets. However, the essential question remains the same: Did the debtor have the requisite intent to hinder, delay, or defraud creditors.

As to the $1,500 cash transfer on December 24, 1986, this Court finds that debtor did *not* have the intent to hinder, delay, or defraud creditors. The $1,500 payment was for reimbursement for his son's services in the summer of 1986. Michael testified that he spent 70 to 80 hours helping his father move twice and repairing his father's house and that the $1,500 was reimbursement for the same. Although the payment probably amounts to a preferential transfer under section 547(b), the intent to prefer creditors is not a sufficient substitute for the intent to hinder, delay or defraud creditors under section 727(a)(2)(A). *See* 4 Collier on Bankruptcy ¶ 727.02[3] (15th ed. 1988). *See also In re McCall*, 76 B.R. 490 (Bankr.E.D.Pa.1987); and *In re Ayers*, 25 B.R. 762 (Bankr.M.D.Tenn.1982).

The last transfer in question to his son is the deeding of the 10% interest in the 19 West 14th Street property in December of 1986. Fine originally owned 61% of the real estate. Fine testified that he deeded the interest to Michael because he felt some sort of obligation to him for giving him some very poor investment advice in late 1985. Apparently, Michael Fine lost $7,500 in a phone company investment, on the advice of his father. Both Michael and Marvin Fine testified that Marvin really transferred the 10% interest in late 1985. However, according to the debtor, he did not get around to actually deeding the property until December of 1986.

To be honest, this Court is not sure whether to believe this story or not. There is some evidence substantiating his story, i.e., the prior financial statements. There is also some evidence refuting his story, i.e., his 2004 examination. However, this Court must give the debtor the benefit of the doubt and find that the plaintiff failed to prove intent by clear and convincing evidence. After all, we are talking about a miniscule amount compared to the overall debt picture. The 10% interest was valued at $2,000 and Fine scheduled debts of $1,384,482.51. Courts have found that the fact that the property transferred is of small value tends to negate fraudulent intent. *See In re Terkel*, 7 B.R. 801, 3 C.B.C. 2d 513 (Bankr.S.D.Fla.1980). *See also* Collier, *supra*.

IT IS THEREFORE, BY THE COURT, ORDERED That the plaintiff failed to prove the requisite element of section 727(a)(2)(A) of intent to hinder, delay, or defraud creditors.

IT IS FURTHER, BY THE COURT, ORDERED That judgment on the plaintiff's complaint objecting to discharge is for the defendant/debtor, Marvin Fine, and against the plaintiff, Douglas County Bank.