In re William Joseph DAVIS, Debtor.

BARTLETT FUTURES, INC., Plaintiff,

v.

William Joseph DAVIS, Defendant.

Bankruptcy No. 88–21825–7.
Adv. No. 89–0028.

United States Bankruptcy Court,
D. Kansas.

March 19, 1991.

John Aisenbrey and Cynthia F. Grimes of Stinson, Mag & Fizzell, Overland Park, Kan., for plaintiff.

Richard C. Wallace of Evans & Mullinix, Kansas City, Kan., for defendant.

## MEMORANDUM OPINION AND ORDER

BENJAMIN E. FRANKLIN, Chief Judge.

This matter comes on for trial before the Court on March 7 and 8, 1990 pursuant to the Plaintiff's Complaint Objecting to Discharge under 11 USC § 727(a)(2)(A), or in the alternative seeking determination of dischargeability of debt under 11 USC § 523(a)(6). The plaintiff, Bartlett Futures, Inc., appeared through its counsel, John Aisenbrey and Cynthia F. Grimes, of the law firm of Stinson, Mag & Fizzell. The defendant appeared in person and through his counsel, Richard C. Wallace of the law firm of Evans & Mullinix.

## FINDINGS OF FACT

Based upon the pleadings and the record, this Court finds as follows:

1. That prior to August 1987, William Joseph Davis, (hereinafter "debtor") had cleared his trades through Wolcott–Lincoln at the Kansas City Board of Trade.

2. That from August 4, 1987 to October 20, 1987, debtor was a non-clearing member of the Board of Trade of Kansas City, Missouri, Inc. (hereinafter "KCBOT") and traded at the KCBOT.

3. That from August 4, 1987 to October 20, 1987, Bartlett Futures, Inc. (hereinafter "plaintiff") acted as the primary clearing member for debtor at the KCBOT. The plaintiff cleared and guaranteed the debtor's trades. (The term "clearing member" means a member of the Exchange who has been admitted to membership in The Options Clearing Corporation pursuant to the provisions of the rules of said corporation.)

4. That on October 18, 1987, debtor and his wife, Leslie A. Davis, had an insured market account at Franklin Savings Association containing a balance of $99,062.96; and two accounts at Capitol Federal Savings and Loan Association, with balances of less than $3,000 each.

5. That on October 19, 1987, now known as "Black Monday", the stock market crashed.

6. That at approximately 10:30 a.m. on October 19, 1987, the trading cards turned in to plaintiff by the debtor revealed that the debtor's account was in a deficit position. Plaintiff then issued a margin call of $100,000 to debtor to bring his account out of its deficit balance. Pursuant to the Commodity Customer Agreement between plaintiff and debtor, the debtor was mandated to maintain margin requirements as specified by the plaintiff.

7. That at the close of the market on October 19, 1987, plaintiff issued a margin call of $510,000 to debtor, which he was unable to meet.

8. That plaintiff filed a Request for Arbitration before the Arbitration Committee of the Kansas City Board of Trade; and, on April 29, 1988, the committee rendered its decision in favor of the plaintiff, Bartlett Futures, Inc. and awarded it the sum of $409,586.04.

9. That on October 12, 1988, the Honorable Howard F. Sachs, United States District Judge for the Western District of Missouri, confirmed the arbitration award of the Board of Trade and directed the clerk to enter the judgment in favor of Bartlett Futures, Inc. for the sum of $409,586.04 with interest from April 29, 1988.

10. That on December 16, 1988, defendant, William Joseph Davis (hereinafter "defendant") filed his petition under Chapter 7 of Title 11 of the United States Code.

11. That on March 28, 1989, plaintiff filed this Complaint Objecting to Discharge or in the Alternative Seeking Determination of Dischargeability of Debt.

12. That on March 7 and March 8, 1990 the trial was held pursuant to the plaintiff's complaint. That after hearing testi-

mony of witnesses and the arguments of counsel, this Court took the matter under advisement upon the simultaneous filing of memorandum briefs by the parties.

13. That on July 5, 1990, this Court issued its Order dismissing the § 727(a)(3) and § 727(a)(5) counts. Plaintiff's § 523(a)(6) and § 727(a)(2) counts were taken under advisement.

## CONCLUSIONS OF LAW

### I.

Under Title 11 of the United States Code, § 523(a)(6) provides in pertinent part as follows:

(a) A discharge under section 727, ... of this title does not discharge an individual debtor from any debt—

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

■ The creditor who objects to a discharge under this section has the burden of proving a willful *and* malicious injury by a preponderance of the evidence. *Grogan v. Garner,* — U.S. —, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

The "willful" element is defined as "conduct that is volitional and deliberate and over which the debtor exercises meaningful control, as opposed to unintentional or accidental conduct." *In re Posta,* 866 F.2d 364, 367 (10th Cir.1989).

■ In order to determine whether the debtor's conduct met these elements, this Court must consider the events that were occurring at the time of the alleged wrong. Friday, October 16, 1987 saw the Dow Jones Industrial Average (hereinafter "DJIA") drop 108 points. *In re Scarlata,* 112 B.R. 279, 284 (Bankr.N.D.Ill.1990). Due to the debtor's losses, Bartlett issued a $30,000 margin call, which was satisfied by the debtor. On October 19, 1987, now known as "Black Monday," the DJIA plummeted an estimated 508 points. At 8:30 a.m. the debtor had a balance of $68,000 in his equity account with plaintiff but, (within two minutes) at 8:32 a.m., the debtor's account was reduced to a negative balance of ($38,906). Despite this negative balance, the debtor continued to actively trade in the pit at the KCBOT. The debtor testified that on October 19, 1987 he was the only trader actively buying contracts. The trading cards turned in by the debtor at approximately 10:30 a.m. revealed to the plaintiff that debtor/defendant's equity account was deficit.

Pursuant to the rules of the KCBOT, if a Futures Commission Merchant (hereinafter "FCM") determines that an account is in a deficit position, then the trader must deposit additional funds to bring his account out of the deficit. Thus, Cindy Owens, the vice president of plaintiff, attempted to locate the debtor to make a margin call. Ms. Owens located the debtor on the floor at approximately 11:35 a.m. The debtor, at the time, was still placing orders for S & P contracts (Standard & Poor's futures contracts are traded at the Chicago Mercantile Exchange.) Ms. Owens testified that she told the debtor that $100,000 was needed to balance his equity account. She demanded that he turn in his trading cards so that she could determine his positions in the market, but the debtor refused to do so. The debtor then secreted himself from the plaintiff.

Shortly after 1:00 p.m., Ms. Owens and Robert Berg, the president of the plaintiff, met with the president and chairman of the KCBOT and members of its Audits and Investigation Committee to discuss the absence of the debtor and the missing trading cards. Plaintiff then proceeded to liquidate the debtor's bond positions. Although a search was made for the debtor, his whereabouts were undiscovered until approximately 2:00 p.m. that day. The debtor was located in his office by Jim Paulsen (another trader at the KCBOT), at which time the debtor gave his trading cards to the plaintiff, who then proceeded to make a margin demand of $510,000 to the debtor. Due to the lateness of day the plaintiff was unable to liquidate the debtor's positions until the next morning (October 20, 1987), at which time said plaintiff had sustained a net loss of $409,586.04. Plaintiff then served a demand letter upon the debtor, but received no response. Plaintiff thereafter filed a Request for Arbitration before the Arbitra-

tion Committee of the KCBOT, which was granted. The Arbitration Committee rendered its decision in favor of the plaintiff for $409,586.04, and the same was confirmed by the United States District Court for the Western District of Missouri, plus interest from April 29, 1988.

The debtor testified that he did not want Ms. Owens to liquidate his account at 11:44 a.m. because he knew that the market would come back around and he would make money.

The debtor's experience in the industry of approximately five years indicates that he was aware of the importance of turning in his trading cards.

This Court finds that the debtor's actions resulted in willful and malicious injury to the plaintiff and thus, the debt of $409,-586.04 is found to be nondischargeable under § 523(a)(6).

## II.

It is stated in 11 U.S.C. § 727 in pertinent part as follows:

(a) The court shall grant the debtor a discharge, unless—

(2) the debtor, with the intent to hinder, delay or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition;

This Court stated in *In re Fine*, 89 B.R. 167 (Bankr.D.Kan.1988) that § 727(a)(2)(A) requires four elements to be proved in order for this Court to deny a debtor's discharge:

(1) a transfer of property has occurred; (2) the property was property of the debtor; (3) the transfer occurred within one year of the filing of the petition; and (4) the debtor had, at the time of the transfer, the intent to hinder, delay or defraud a creditor.

*Id.* at 173. The Plaintiff bears the burden of proof in objecting to the discharge of the debtor. *Id. See* Bankruptcy Rule 4005.

In the case at bar, the plaintiff has proven the first element. The debtor and his wife, Leslie M. Davis, maintained a market account at Franklin Savings Association containing a balance of $99,062.96. They also maintained two passcard accounts at Capitol Federal Savings and Loan Association, neither account containing a balance of over $3,000. After several checks had cleared the Franklin account on October 19, 1987, the debtor testified that he instructed his wife to withdraw some cash from the account because he feared the banks would be closing. She proceeded thereafter to close the Franklin account and received a cashier's check for $49,062.96. She maintained custody of the check until she returned it to Franklin Savings on November 30, 1987, at which time she exchanged the same for two cashier's checks, one payable to herself in the amount of $32,945.46, and the other payable to Smith Barney in the amount of $16,117.50.

The second element has also been proven by the plaintiff. The debtor earned approximately $120,000 in both 1986 and 1987. The debtor testified that most of the monies in the Franklin account belonged to him. Further, the debtor's wife only earned approximately $6,000 in the years 1985, 1986 and 1987. Thus, this Court determines that the property was substantially that of the debtor.

■ In the case at bar, the actual transfer of the funds from the joint account occurred on October 19, 1987, more than one year prior to the debtor's filing bankruptcy on December 16, 1988. Thus, technically, under the literal language of § 727(a)(2)(A) the transaction at issue would not meet the requirements. However, this Court has found that "even if the objectionable act or acts occurred more than one year before bankruptcy, it may still provide a basis for an objection to discharge if it operates as a 'continuing concealment.'" *In re Hodge,* 92 B.R. 919, 922 (Bankr.D.Kan.1988); *See Matter of Hazen,* 37 B.R. 329, 332 (Bankr.M.D.Fla.

1983); *In re Oliver,* 819 F.2d 550 (5th Cir. 1987). Moreover, whether the debtor retained any beneficial interest in the property is evidence of whether continuing concealment of the transaction is taking place. *In re Hodge,* 92 B.R. at 922; *In re Penner,* 107 B.R. 171, 175 (Bankr.N.D.Ind.1989).

■ In the case at bar, the wife withdrew the funds from the joint account at Franklin on October 19, 1987. First, she withdrew $35,000 from the account in the form of cash on October 19, 1987. She then returned to Franklin, after an employee of the plaintiff came and talked to her at her house, and proceeded to close out the Franklin account. She held the proceeds in one cashier's check for over a month. She then returned the check to Franklin so that Franklin could issue her two cashier's checks: one made out to Smith Barney so that she could open a stock account with them; and the second cashier's check of $32,945.46 was held by her, with the debtor's knowledge, until she opened an account in her name only at Colonial Savings in the amount of $37,896.78. The debtor's wife further testified that she used the monies for living expenses. Testimony further indicated that the monies were also used for a trip to Las Vegas.

This Court finds that based on the foregoing, even though the transaction took place more than one year before the filing of the debtor's bankruptcy, the debtor retained a beneficial interest in the property and it was a continuing concealment of the assets. *In re Hodge,* 92 B.R. at 922.

■ In order for this Court to determine if the debtor, at the time of the transfer, had the intent to hinder, delay or defraud a creditor, it must also look at what has been termed the "badges of fraud." As was noted in *Fine,* there are seven badges of fraud which must be considered. While all seven badges need not be proved to deny the discharge of the debtor, there must be "sufficient indicia to rise to the level of clear and convincing evidence" of the debtor's intent to hinder, delay or defraud creditors. *In re Fine,* 89 B.R. 167, 174 (Bankr. D.Kan.1988) [This Court notes that a recent United States Supreme Court decision has changed the standard of evidence to "a preponderance of the evidence." *See Grogan v. Garner,* —— U.S. ——, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) ].

One badge of fraud is that "the debtor and the transferee enjoyed a family, friendship, or close associate relationship." *Fine,* 89 B.R. at 174. Here, the transfer was from the husband and wife's joint account with Franklin to solely the wife. When a transfer of property to a family member occurs, this Court must look at another indicia of fraud: whether the transfer was gratuitous or if the debtor received adequate consideration. *In re Hiegel,* 117 B.R. 655, 658 (Bankr.D.Kan. 1990); *In re Fine,* 89 B.R. at 175; *In re Butler,* 38 B.R. 884 (Bankr.D.Kan.1984). In the case at bar, the transfer was made to the debtor's wife without consideration. As this Court has previously found, most of the monies in the Franklin account were placed there by the debtor. Thus, this Court finds that the transfer was gratuitous.

Another badge of fraud is that "the debtor retained the possession, benefit, or use of the property in question." *Fine,* 89 B.R. at 174. Based upon the Court's previous finding that the debtor engaged in a continuing concealment of the monies, this Court now finds that the debtor retained the benefit and use of the property.

Admittedly, the plaintiff has proved two of the seven badges of fraud. However, the Court finds that the plaintiff has failed to prove by a preponderance of the evidence that the debtor intended to hinder, delay or defraud his creditors, as required by § 727(a)(2)(A). The debtor's wife testified that she withdrew the monies from the Franklin account because she did not know what her husband would do with the monies, and that she also feared that the banks would have a banker's holiday and would shut down as they had done in the previous stock market crash. She further testified that when she withdrew the monies she then took control over the family finances, keeping the cashier's check for a time in the kitchen due to the instability of her marriage as her husband's drinking

problems increased after the stock market crash.

IT IS THEREFORE, BY THE COURT, ORDERED That the Plaintiff's Complaint Objecting to Discharge under § 727(a)(2)(A) be and the same is hereby DENIED.

IT IS FURTHER, BY THE COURT, ORDERED That under § 523(a)(6), judgment be for the plaintiff and against the defendant, and the debt of $409,586.04 shall be and the same hereby is NOT DISCHARGED.

IT IS FURTHER, BY THE COURT, ORDERED That plaintiff's request for attorneys fees and costs under Bankruptcy Rule 7008(b) be and the same are hereby DENIED.

This Memorandum shall constitute my Findings of Fact and Conclusions of Law under Bankruptcy Rule 7052 and Rule 52(a) of the Federal Rules of Civil Procedure.