

---

Douglas Quinn of McGrath, North, Mullin & Kratz, P.C., Omaha, Neb., for trustee and the Bank of Hemingford.

Michael Helms of Schmid, Mooney & Frederick, P.C., Omaha, Neb., for debtors.

### MEMORANDUM

TIMOTHY J. MAHONEY, Chief Judge.

Trial was held on July 6, 1988, on creditor and trustee objections to exemptions claimed by the debtors. The parties provided post-trial argument and briefs which the Court has now considered. This memorandum constitutes the Court's findings of fact and conclusions of law required by Bankr.R. 7052.

**In the Matter of David and Hannah ARMSTRONG, Debtors.**

**Bankruptcy No. BK86–3714.**

United States Bankruptcy Court, D. Nebraska.

Nov. 28, 1988.

As Corrected Dec. 2, 1988.

### *Facts*

The debtors filed a Chapter 11 petition on December 31, 1986, and voluntarily converted that proceeding to a case under Chapter 7 on May 1, 1987. On their bankruptcy schedules, the debtors claim cash value and various annuity policies in the total sum of $377,918 to be exempt property pursuant to Neb.Rev.Stat. § 44–371 (Reissue 1984). That statute, as of the date of the filing of the bankruptcy petition, generally exempted from the claim of creditors, including a trustee in bankruptcy, all proceeds, cash values and benefits under annuity contracts and life insurance policies. The statute has now been amended, effective August 30, 1987, to establish a cap of $10,000 for exemption purposes on the aggregate cash values of annuity contracts and life insurance policies owned by a debtor.

Of the total amount claimed exempt, $377,918, there is at issue only the legitimacy of an exemption for annuities with an approximate value of $303,000 which were purchased with the proceeds from the sale of debtors' assets and other debtor funds.

A debtor in the District of Nebraska filing a bankruptcy petition may exempt property authorized under the Nebraska statutes rather than the exemptions authorized by the Bankruptcy Code at 11 U.S.C. § 522 because the Nebraska Legislature in 1980 opted out of the bankruptcy exemption scheme. *See* Neb.Rev.Stat. § 25–15,105 (Reissue 1985).

The debtors were farmers who by late summer of 1986 were having significant financial difficulty. The Bank of Hemingford was the main operating lender for the debtors. In the summer and fall of 1986, the debtors and the Bank of Hemingford entered into discussions with regard to the financial obligations of the debtors.

Debtors are residents of Alliance, Box Butte County, Nebraska. They operate a grain farm in Box Butte County and David is a shareholder officer and director of Maverick Land and Cattle Co. (Maverick), a corporation that owns land and cattle in Brown County, Nebraska. The corporation has existed for many years and the sole shareholders, officers and directors have always been David and his father Ted. David has been in charge of operations.

Maverick has always needed funds from outside sources to finance operations. Generally, Ted has financed the operation either directly or through bank loans. In the early 1980's, Ted, formerly a resident of Nebraska but now a resident of Florida, borrowed money from a Florida bank and secured the loan with his personally owned shares of stock in listed corporations. The funds were placed directly into Maverick and Maverick paid the interest and principal directly. In addition, Ted also loaned Maverick funds from his own resources. Maverick paid the interest and principal directly to Ted.

Beginning in 1985, Maverick had a banking relationship with Omaha State Bank. It had a line of credit in the maximum amount of $200,000 until the fall of 1986. In early October, 1986, Ted arranged for Omaha State Bank to increase the line of credit to $600,000, secured by his own stock holdings in listed corporations other than Maverick. Maverick, as part of the early October 1986 transaction, drew down on the loan, paid off all debts it owed Ted and paid off all debts it or Ted owed to the Florida bank. Ted then used some of the money he received from Maverick to purchase 1800 shares of Maverick stock from David for $79,000. This occurred on October 7, 1986. Such purchase reduced David's property ownership interest from 6,250 shares versus Ted's 3,750 shares to 4,950 shares versus Ted's new majority interest of 5,050 shares.

Ted explains the transaction in terms of giving control of the business to the shareholder who really had the most at risk. Although he had always financed the business, he decided in October, 1986, that he would not only have most of the financing risk but would have the majority control. David used the $79,000 for the purchase of one of the annuity policies now claimed as exempt and at issue here.

As part of the Maverick loan restructuring with the Omaha State Bank, David pledged his Maverick stock, his personal vehicles and several life insurance policies as collateral. An officer of the Omaha State Bank testified that none of David's collateral was requested, because Ted's collateral was sufficient to support the loan. However, David and Ted told the banker that Ted thought it was important that David have some of his assets at risk for the Maverick loan.

On October 15, 1986, David and Hannah agreed to sell their home in Alliance to Ted for $157,400 and a deed was executed and recorded on October 24, 1986, representing such conveyance. The value was determined by an independent appraiser hired by David. Ted had known of the debtors' financial problems as early as mid-summer 1986.

David and Hannah used the proceeds of the sale of their home and other funds to purchase the other annuity policy at issue

here. They then remained in the home rent free for several months, although at the time of trial David claimed he was paying $650 per month rent.

Just before the sale of the Maverick stock, the sale of the house and the purchase of annuities, negotiations broke down between debtors and the Bank of Hemingford concerning their personal debt to it. Their debt to the Bank of Hemingford exceeded $800,000 and was partially secured by a second mortgage on farm ground in Box Butte County and certain equipment. On October 6, 1986, the Bank of Hemingford notified debtors' lawyer that a lawsuit in replevin had been filed by the Bank against David and Hannah. Debtors were served with process in the state court suit on October 14, 1986.

Debtors' lawyer is in the same firm as Ted's lawyer. Ted's lawyer was, at all times pertinent here, an officer, director, and shareholder of the Omaha State Bank and was the person who brought Ted's business to the Omaha State Bank.

To summarize, within a few days after negotiations broke down between debtors and The Bank of Hemingford, a lawsuit was filed, David valued and sold a majority interest in his Maverick stock to his father and voluntarily encumbered all of his other personal assets; David and Hannah sold their home to Ted, although they continued to reside in it without rent payments; debtors took all funds received from the transactions with Ted and purchased the annuity contracts now claimed as exempt from creditors and at issue here.

On December 31, 1986, debtors filed a petition under Chapter 11 of the Code, which was voluntarily converted to Chapter 7 on May 1, 1987. Objections to the annuities claimed as exempt were timely filed by the Bank of Hemingford and the Trustee.

## Discussion and Conclusions of Law

The objectors claim that the financial transactions which ultimately provided the funds to the debtors for the purchase of $303,000 in annuities were fraudulent as to creditors and that the exemptions should, therefore, be set aside. The objectors' theory is that although the applicable Nebraska statutes permit debtors to exempt unlimited amounts of annuity values, other Nebraska statutory provisions prohibit the creation of exempt assets by actions which move nonexempt property into the exempt property classification with an intent to hinder, delay or defraud creditors.

Debtors' response is that Nebraska law absolutely permits the creation of exempt property from nonexempt property and the intent of the debtor simply is not a factor to be considered by the Court.

The objectors further argue that although exemptions are determined by state law, the validity of the claim of exemption when a debtor has filed bankruptcy is determined as a matter of federal law. Therefore, it is the view of the objectors that even if Nebraska law precludes a court from considering the debtor's intent when property is transformed from nonexempt to exempt status, once the debtor files bankruptcy and seeks to claim such property as exempt under the Bankruptcy Code, the court must consider and give effect to federal law when finally determining the validity of an exemption in the face of a claim of fraud on the creditors.

The pertinent part of the Nebraska exemption statute in question read, at the time the petition was filed, as follows:

*Section 44–371. Annuity Contract, Insurance Proceeds and Benefits; exempt from claims of creditors; exception.* All proceeds, cash values and benefits accruing under any annuity contract, or under any policy or certificate of life insurance payable upon the death of the insured to a beneficiary other than the estate of the insured, and under any accident or health insurance policy, issued before, on, or after August 30, 1981, shall be exempt from attachment, garnishment, or other legal or equitable process, and from all claims of creditors of the insured, and of the beneficiary if related to the insured by blood or marriage, unless a written assignment to the creditor has been obtained by the claimant.

Section 44–371 was amended by the Nebraska Legislature both in 1980 and in

1981. Neither amendment placed a cap upon the amount which could be claimed as exempt or qualified the exemption based upon the source of the funds.

In its 1980 session, the Nebraska Legislature adopted the Uniform Fraudulent Conveyance Act at Neb.Rev.Stat. §§ 36–601 to 613. Section 36–604 provides that "every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his or her actual intent if the conveyance is made or the obligation is incurred without a fair consideration."

The transactions which could bring the debtors under the Fraudulent Conveyance Act are those concerning the sale of the Maverick stock to Ted and the sale of the house to Ted. Under § 36–604, if the sales rendered debtors insolvent and were without fair consideration, they would be considered fraudulent under the Act.

Insolvency is defined at § 36–602: "A person is insolvent when the present fair saleable value of his or her assets is less than the amount that will be required to pay his or her probable liability on his or her existing debts as they become absolute and matured."

At § 36–603 the Legislature provided a definition for fair consideration.

Fair consideration is given for property, or obligation,

(a) when in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

(b) when such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

By adopting the Uniform Fraudulent Conveyance Act, the Legislature also determined the effect of conveyances made with actual intent to defraud. Section 36–607 provides "every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in

law, to hinder, delay or defraud either present or future creditors, is fraudulent as to both present and future creditors."

From the objectors' point of view, the sale of the debtors' home to David Armstrong's father was probably not for fair consideration under the Uniform Fraudulent Conveyance Act definition because, although it was sold for a value determined by a legitimate appraiser, the debtor employed the appraiser, the sale was to the father of one of the debtors, and, until very recently, the debtors not only continued living in the house but had no agreement to pay rent to the father.

From the objectors' point of view, the sale of David Armstrong's interest in Maverick to his father was not for fair consideration because the amount arrived at had no reasonable relationship to the value of David Armstrong's stock as he had previously indicated in financial statements filed with the Bank of Hemingford. In other words, he and his father agreed to the sale and purchase of stock based upon general discussions the two of them had during several telephone conversations and such discussions had nothing to do with an analysis of the overall liquidation value of the corporation.

From the objectors' point of view, the transactions by which the debtors relieved themselves of Maverick stock and their home and provided them with "exempt" property, left the debtors insolvent as that term is used in the Uniform Fraudulent Conveyance Act. Specifically, when adding up the value of assets remaining after the transactions excluding the "exempt" property, the "fair saleable value" of the debtors' assets is less than the amount required to pay debtors' debts as they become absolute and matured.

The objectors urge this Court to apply the definition of fraud or fraudulent conveyance under the Uniform Fraudulent Conveyance Act to the facts of this case and to make a finding that the actions of the debtors are fraudulent within the definition of § 36–604 or § 36–607. The objectors then want the Court to fashion a remedy and it is suggested that the appropriate remedy is to set aside the exempt status or

to refuse to consider the annuity asset now held by the debtors as exempt from the trustee or creditors. The Court declines to make such findings. The Uniform Fraudulent Conveyance Act as adopted by the Nebraska Legislature provides specific remedies to creditors when the appropriate findings are made concerning the conveyance made by an insolvent or made with intent to defraud. The Legislature has defined the rights of creditors whose claims have matured at § 36–609 and the rights of those whose claims have not matured at § 36–610. Depending on the status of the claim, a creditor may (1) have the conveyance which is fraudulent set aside; (2) disregard the conveyance and attach or levy execution upon the property conveyed; (3) have a party restrained from disposing of property; (4) have a receiver appointed to take charge of the property; or (5) have the conveyance set aside or the obligation annulled.

The transactions which may be defined as fraudulent are the sale of stock and the sale of the house. These are separate acts from the purchase of annuity contracts using the proceeds of such transactions. The sales to Ted may eventually be determined to be fraudulent transfers in a now pending adversary proceeding. In addition, such sales, if fraudulent, may enable the court to find that the debts of these debtors should not be discharged under 11 U.S.C. § 727(a).[1]

Courts across this nation have struggled for many years in an attempt to determine what intent, if any, of the debtor and what action of the debtor is so bad, so much against public policy or so fraudulent as to creditors that a court should determine property which is clearly exempt under state statutes is nonexempt in bankruptcy and, therefore, available to trustees and creditors. Two Nebraska cases have been cited, one for the proposition that the intent of the debtor in transferring property from nonexempt to exempt status matters, *see In re Boston,* 98 F. 587 (D.Neb. 1899) (fraudulent acts which permit debtors to create an exemption must be considered), one for the proposition that intent does not matter, *see Paxton v. Sutton,* 53 Neb. 81, 73 N.W. 221 (1897) (debtor's intention to keep property from creditors by investing it in a homestead is not to be considered when determining the validity of the exemption). For a discussion of cases from other jurisdictions, *see* Hardin, *Conversion of Nonexempt Property to Exempt Property on the Eve of Bankruptcy in Arkansas,* 10 U.Ark.Little Rock L.J. 719 (1987–88).

The Eighth Circuit has discussed a factual situation similar to the one in this case in *Hanson v. First Nat'l. Bank,* 848 F.2d 866 (8th Cir.1988). In *Hanson,* the court affirmed a bankruptcy court order and district court decision rejecting the creditor's challenge to the debtors' claimed exemptions. The debtors were farmers who had borrowed from the bank. Within a short time prior to filing bankruptcy and after consultation with an attorney, the debtors sold certain of their property which would not be exempt under South Dakota law and used the proceeds both to purchase life insurance policies with cash surrender values and to prepay their homestead real estate mortgage. Both the homestead and the cash surrender value of the life insurance policies were exempt under South Dakota law.

The issue on appeal was whether the Hansons should be denied their property claimed as exempt because it was a product of a fraudulent conveyance. The Court recited the general rule that "a debtor's conversion of non-exempt property to exempt property on the eve of bankruptcy for the express purpose of placing that property beyond the reach of creditors, without more, will not deprive the debtor of an exemption to which he otherwise would be

---

1. Section 727. Discharge.
  (a) The court shall grant the debtor a discharge unless—
       *     *     *     *     *     *
    (2) the debtor, with intent to hinder, delay or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
    (A) property of the debtor, within one year before the date of the filing of the petition[.]

entitled." *Id.* at 868 (citations omitted). The court went on to state that "[a]bsent extrinsic evidence of fraud, ... the debtors' mere conversion of non-exempt property to exempt property, even while insolvent, is not evidence of fraudulent intent as to creditors." *Id.* The Court did not specify what "extrinsic evidence" of fraud means, nor did it discuss the Uniform Fraudulent Conveyance Act.

Both the type of property which is claimed as exempt and the manner in which such property is created should be considered to be a state law question subject only to consideration of the federal "extrinsic evidence of fraud" standard articulated in *Hanson* and other Eighth Circuit decisions. The Nebraska Supreme Court has often stated that the exemption statutes are to be liberally construed to effectuate their statutory purpose. *See generally In the Matter of Welborne,* 63 B.R. 23, 25–26 (Bankr.D.Neb.1986); *In re Estate of Grassman,* 183 Neb. 147, 152, 158 N.W.2d 673, 676 (1968); *Hawley v. Arnold,* 137 Neb. 238, 288 N.W. 823 (1939); Duncan, *Through the Trapdoor Darkly: Nebraska Exemption Policy and the Bankruptcy Reform Act of 1978,* 60 Neb.L.Rev. 219, 241, 252 (1981). The state legislature, in a jurisdiction such as Nebraska which has opted out of the federal exemption scheme under the Bankruptcy Code, makes specific determinations of the type of property and the extent of such property which should be determined to be free from claims of creditors under state law.

The Nebraska Legislature has shown by its activities since 1978 that when it, as a legislative body, determines that there is a problem with the exemptions which are available to the residents of Nebraska, the Legislature acts to change those exemptions. For example, it has changed the amount available as a homestead exemption under Neb.Rev.Stat. § 40–101 twice since 1978. In addition, in the face of creditor concerns about the abuse of the statutory provision which is being considered in this case, the Nebraska Legislature acted and put a cap upon the amount of an annuity which can be considered as exempt from creditor's claims. *See* Neb. Rev.Stat. § 44–371 (Supp.1987). Further,

the Nebraska Legislature determined that certain transactions within a specified amount of time of either a bankruptcy filing or a final judgment should be considered suspect and the proceeds of such transaction should not be considered as exempt under the statutes. *See* Neb.Rev. Stat. § 25–1563.01 (Supp.1987). This section, adopted by the same legislative session that put a cap upon the annuity exemption, provides that certain pension, profit-sharing or similar plans are exempt from creditor claims unless

(1) [w]ithin two years prior to bankruptcy or to entry against the individual of a money judgment which thereafter becomes final, such plan or contract was established or was amended to increase contributions by or under the auspices of the individual or of an insider that employed the individual at the time the individual's rights under such plan or contract arose; or (2) [s]uch plan or contract does not qualify under Section 401(a), 403(a), 403(b), or 408 of the Internal Revenue Code of 1986 or the successors of such sections.

In each of the above legislative enactments, the Nebraska Legislature either expanded the amount of the exemption, limited the amount of the exemption, or created a new exemption, but limited its applicability to avoid what the Legislature apparently perceived as an abusive practice by debtors. Nonetheless, the Legislature, when enacting such provisions, did not prohibit debtors from claiming certain property as exempt simply because the exempt property was created by the sale of other debtor property, the sale of which may have violated the fraudulent conveyance statute.

The Legislature apparently determined that there were abuses with regard to the annuity statute being considered in this case. The Legislature acted to curb such abuses. However, the Legislature chose to limit the amount which could be claimed as exempt rather than limiting the exemption based upon the source of the funds.

▪ It is inappropriate for this Court to engraft upon the Nebraska exemption statutes any exception based upon the intent of the debtor. It is also inappropriate to collapse the transactions from two sales of

non-exempt assets and the investment of the proceeds in an exempt asset, and find that these three separate activities are one "conveyance" violating the fraudulent transfer act, and thereby find the extrinsic evidence of fraud required to set aside the exemption. The reason such a transaction collapse is inappropriate is that the investment of sale proceeds into an annuity owned by the debtor is not a "conveyance" under the Nebraska Uniform Fraudulent Conveyance Act. Section 36–601 of the Act defines "conveyance" to include "every payment of money, assignment, release, transfer, lease, mortgage, or pledge of tangible or intangible property, and also the creation of any lien or encumbrance."

An investment by debtor of the proceeds of the sales into an annuity which debtor continues to own is not a "conveyance" because there has been nothing given to another entity. The debtor still owns the "value" of the asset but in another form.

Since conversion of non-exempt assets to exempt assets is not prohibited by federal law unless there is extrinsic evidence of fraud, and since this case was tried on the theory that the sales were fraudulent so the exemption is invalid, and since the Nebraska Legislature has taken advantage of the opportunity afforded it by Congress to opt out of the federal exemption scheme, this Court does not find that the debtors' activities exhibit "extrinsic evidence of fraud" which might require a denial of exemptions.

Finally, the legislation has provided creditors a statutory remedy for fraudulent conveyances. *See* Neb.Rev.Stat. §§ 36–601 to 613. Congress has provided a remedy for fraudulent activity by debtors at 11 U.S.C. § 727. There is no need for a Bankruptcy Judge to assume this legislative function. *See In re Johnson,* 80 B.R. 953 (Bankr.D.Minn.1987) (prohibiting exemption claims is a legislative, not judicial, function).

In conclusion, the objection to exemptions is overruled. Separate journal entry shall issue.