**In the Matter of David & Hannah ARMSTRONG, Debtors.**

**BANK OF HEMINGFORD, Plaintiff,**

**v.**

**David & Hannah ARMSTRONG, Defendant.**

**Bankruptcy Nos. BK86–3714, A87–251.**

United States Bankruptcy Court, D. Nebraska.

March 2, 1989.

Douglas Quinn, Omaha, Neb., for plaintiff.

Michael Helms, Omaha, Neb., for debtors.

MEMORANDUM

TIMOTHY J. MAHONEY, Chief Judge.

This matter is before the Court on the objection to discharge based upon 11 U.S.C. § 727(a)(2) filed by the Bank of Hemingford. Pursuant to its order, dated September 22, 1988, the Court has considered the briefs submitted on this matter, plus all evidence previously submitted at the July 6, 1988, trial on objections to exemptions. This memorandum constitutes the Court's findings of fact and conclusions of law required by Bankr.R. 7052.

Attorney for the Bank of Hemingford is Douglas Quinn of McGrath, North, Mullin & Kratz, P.C., Omaha, Nebraska; attorney for the debtors is Michael Helms of Schmid, Mooney & Frederick, P.C., Omaha, Nebraska.

*Facts*

The following facts set out in the Court's Memorandum on objections to exemptions, dated November 28, 1988,[1] shall be restated here:

The debtors were farmers who by late summer of 1986 were having significant financial difficulty. The Bank of Hemingford was the main operating lender for the debtors. In the summer and fall of 1986, the debtors and the Bank of Hemingford entered into discussions with regard to the financial obligations of the debtors.

Debtors are residents of Alliance, Box Butte County, Nebraska. They operate a grain farm in Box Butte County and David

---

**1.** *In re Armstrong,* 93 B.R. 197 (Bankr.D.Neb. 1988).

is a shareholder officer and director of Maverick Land and Cattle Co. (Maverick), a corporation that owns land and cattle in Brown County, Nebraska. The corporation has existed for many years and the sole shareholders, officers and directors have always been David and his father Ted. David has been in charge of operations.

Maverick has always needed funds from outside sources to finance operations. Generally, Ted has financed the operation either directly or through bank loans. In the early 1980's, Ted, formerly a resident of Nebraska but now a resident of Florida, borrowed money from a Florida bank and secured the loan with his personally owned shares of stock in listed corporations. The funds were placed directly into Maverick and Maverick paid the interest and principal directly. In addition, Ted also loaned Maverick funds from his own resources. Maverick paid the interest and principal directly to Ted.

Beginning in 1985, Maverick had a banking relationship with Omaha State Bank. It had a line of credit in the maximum amount of $200,000 until the fall of 1986. In early October, 1986, Ted arranged for Omaha State Bank to increase the line of credit to $600,000, secured by his own stock holdings in listed corporations other than Maverick. Maverick, as part of the early October 1986 transaction, drew down on the loan, paid off all debts it owed Ted and paid off all debts it or Ted owed to the Florida bank. Ted then used some of the money he received from Maverick to purchase 1800 shares of Maverick stock from David for $79,000. This occurred on October 7, 1986. Such purchase reduced David's property ownership interest from 6,750 shares versus Ted's 3,250 [2] shares to 4,950 shares versus Ted's new majority interest of 5,050 shares.

Ted explains the transaction in terms of giving control of the business to the shareholder who really had the most at risk. Although he had always financed the business, he decided in October, 1986, that he would not only have most of the financing risk but would have the majority control.

David used the $79,920 for the purchase of one of the annuity policies.

As part of the Maverick loan restructuring with the Omaha State Bank, David pledged his Maverick stock, his personal vehicles and several life insurance policies as collateral. An officer of the Omaha State Bank testified that none of David's collateral was requested, because Ted's collateral was sufficient to support the loan. However, David and Ted told the banker that Ted thought it was important that David have some of his assets at risk for the Maverick loan.

On October 15, 1986, David and Hannah agreed to sell their home in Alliance to Ted for $157,400 and a deed was executed and recorded on October 24, 1986, representing such conveyance. The value was determined by an independent appraiser hired by David. Ted had known of the debtors' financial problems as early as mid-summer 1986.

David and Hannah used the proceeds of the sale of their home and other funds to purchase another annuity policy. They then remained in the home rent free for several months, although at the time of trial David claimed he was paying $650 per month rent.

Just before the sale of the Maverick stock, the sale of the house and the purchase of annuities, negotiations broke down between debtors and the Bank of Hemingford concerning their personal debt to it. Their debt to the Bank of Hemingford exceeded $800,000 and was partially secured by a second mortgage on farm ground in Box Butte County and certain equipment. On October 6, 1986, the Bank of Hemingford notified debtors' lawyer that a lawsuit in replevin had been filed by the Bank against David and Hannah. Debtors were served with process in the state court suit on October 14, 1986.

Debtors' lawyer is in the same firm as Ted's lawyer. Ted's lawyer was, at all times pertinent here, an officer, director, and shareholder of the Omaha State Bank

2. These are corrected figures from the Court's

Memorandum of November 28, 1988.

and was the person who brought Ted's business to the Omaha State Bank.

To summarize, within a few days after negotiations broke down between debtors and The Bank of Hemingford, a lawsuit was filed, David valued and sold a majority interest in his Maverick stock to his father and voluntarily encumbered all of his other personal assets; David and Hannah sold their home to Ted, although they continued to reside in it without rent payments; debtors took all funds received from the transactions with Ted and purchased the annuity contracts.

On December 31, 1986, debtors filed a petition under Chapter 11 of the Code, which was voluntarily converted to Chapter 7 on May 1, 1987.

Debtors claimed the annuities, worth approximately $303,000.00, were exempt property under state law and the Bank objected. The Court overruled the objection to exemptions.

### Discussion and Conclusions of Law

The Bank argues that discharge should be denied under 11 U.S.C. § 727(a)(2) because the debtors made transfers with the intent to hinder, delay or defraud a creditor. The Bank points to several factors which, it says, demonstrate such intent. Those factors include the family relationship between debtors, as transferors of the residence and of the Maverick stock, and the transferee, Ted Armstrong; the fact that the appraisal of the residence may have been given after the sale; the amount of the annuities purchased by debtors; the annuity contracts were purchased shortly after the Bank filed a state court collection action against the debtors; the debtors' continued use of the residence after its transfer, without payment of rent; after the transfer of a controlling interest in Maverick stock, David Armstrong continued to direct the day-to-day affairs of Maverick, drawing essentially the same salary; the fact that the restructuring with Omaha State Bank resulted in a more fully secured loan to that bank combined with the fact that Ted's attorney (in the same firm as debtors' attorney) was Omaha State Bank's largest stockholder and a member of committees which reviewed and supervised loans.

Debtors argue (1) that the sale of the residence and the sale of the Maverick stock were made at fair market value; (2) that the amount received by debtors for the residence was determined by an independent appraisal and the amount received by David Armstrong for the sale of his Maverick stock was based upon a determination made by buyer and seller of the net value of the assets owned by Maverick Land and Cattle Co.; (3) that they have paid rent to Ted Armstrong, that the rent was established by an independent appraisal of the rental value, and that Ted Armstrong has been responsible for payment of all insurance, taxes and other expenses of the property since the date of the sale; (4) that the restructuring was initiated by Ted Armstrong upon his determination that if the burden of financial risk was his, then he should have control of the ownership of Maverick; (5) that David Armstrong sold his residence to provide sufficient funds to continue negotiations and complete a settlement with the Bank; the funds were not used to complete a settlement with the Bank, debtors say, because the Bank ceased discussions; (6) that the sale of Maverick stock was completed on October 7, 1986, and negotiations for the sale of the residence began in September, 1986, but that debtors were not aware of the Bank's suit until October 15, 1986; (7) that the value of the residence and the Maverick stock transferred to Ted Armstrong was less than one-half of the debtors' unencumbered assets.

Under 11 U.S.C. § 727(a)(2), the Court will grant the debtor a discharge, unless

the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor within one year before the date of the filing of the petition[.]

Section 727(a)(2)(A) requires that four elements must be proven: (1) a transfer of property occurred; (2) the property was property of the debtor; (3) the transfer occurred within one year of the filing of the petition; and (4) at the time of the transfer, the debtor had the intent to hinder, delay, or defraud a creditor. *In re Fine*, 89 B.R. 167, 173 (Bankr.D.Kan.1988); *In re Clausen*, 44 B.R. 41, 43 (Bankr.D. Minn.1984); *In re Reed*, 18 B.R. 462, 463 (Bankr.E.D. Tennessee 1982).

The first three elements are not in dispute. On October 6, 1986, David Armstrong transferred 1,800 of his stock shares in Maverick to Ted Armstrong which gave Ted controlling interest in Maverick. On October 24, 1986, debtors David and Hannah transferred their home to Ted. The bankruptcy petition was filed on December 31, 1986. The only issue that remains is whether the debtors had, at the time of the transfer, intent to hinder, delay or defraud creditors. *See Fine*, 89 B.R. at 174.

It is well established that under the Code the conversion of non-exempt to exempt property on the eve of bankruptcy, placing the property out of the reach of creditors, without more, will not support a finding of fraudulent intent. *Norwest Bank Nebraska, N.A., v. Tveten*, 848 F.2d 871, 874 (8th Cir.1988); *In re Fine*, 89 B.R. at 174.

The legislative history of the Code "establishes that Congress intended to allow debtors to make full use of statutory exemptions by permitting debtors to convert non-exempt property into exempt property before bankruptcy." *Id.* Both the House and Senate Reports regarding the debtor's right to claim exemptions state:

As under current law, the debtor will be permitted to convert non-exempt property into exempt property before filing a bankruptcy petition. The practice is not fraudulent as to creditors and permits the debtor to make full use of the exemptions to which he is entitled under law.

H.R.Rep. No. 595, 95th Cong. 1st Sess. 361 (1977), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5963, 6317; S.Rep. No. 989, 95th Cong., 2d Sess. 76 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787, 5862.

"This blanket approval of conversion is qualified, however, by denial of discharge if there was extrinsic evidence of the debtor's intent to [hinder, delay or] defraud creditors." *Tveten*, 848 F.2d at 874. *Accord Fine*, 89 B.R. at 174; *Forsberg v. Security State Bank*, 15 F.2d 499, 502 (8th Cir.1926); 4 Collier on Bankruptcy ¶ 727.02 at 727–18 (15th ed.1988).

"In other words, although the mere conversion on the eve of bankruptcy alone is not sufficient to deny a discharge, if the conversion is accompanied by some extrinsic evidence establishing an intent to hinder, delay, or defraud a creditor, then the discharge may be denied." *Fine*, 89 B.R. at 174. *See Tveten*, 848 F.2d at 874; *Forsberg*, 15 F.2d at 502; *In re Oberst*, 91 B.R. 97, 99 (Bankr.C.D.Cal.1988). One court, in attempting to "locate the exact line between bankruptcy planning and hindering creditors," said that if a debtor was only "looking to his future well being," a discharge would be granted but if a debtor had a particular creditor in mind and tried to remove his assets from that creditor's reach, then a discharge would be denied. *Oberst*, 91 B.R. at 101.

The extrinsic evidence that may indicate actual intent to hinder, delay or defraud a creditor in the conversion of non-exempt to exempt assets includes the following:

1) the lack or inadequacy of consideration;

2) the family, friendship or close associate relationship between the parties;

3) the retention of possession, benefit or use of the property in question;

4) the financial condition of the party sought to be charged both before and after the transaction in question;

5) the existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties,

or pendency or threat of suits by creditors;

6) the general chronology of the events in transactions under inquiry.

*Tveten*, 70 B.R. at 534; *In re Clausen*, 44 B.R. 41, 44 (Bankr.D.Minn.1984); *In re May*, 12 B.R. 618, 627 (Bankr.N.D.Fla. 1980). *See also Fine*, 89 B.R. at 174; *Forsberg v. Security State Bank*, 15 F.2d 499, 502 (8th Cir.1926); *Oberst*, 91 B.R. at 99; 4 Collier on Bankruptcy ¶ 727.02 at 727–19 (15th ed.1988).

As to criteria number (1), plaintiff submitted no evidence that the residence was transferred for inadequate consideration. There is no question as to criteria number (2), there was a family relationship between the transferor David Armstrong and the transferee Ted Armstrong. The evidence shows that debtors did retain possession, benefit and use of the residence while paying no rent, thus satisfying criteria number (3). According to their responses for request for admission, debtors were insolvent at the time of the transfers. As to criteria number (5), the transfers of the Maverick stock and debtors' residence occurred after debtors, or at least their attorney, were aware of the Bank's imminent lawsuit.

The general chronology of the transactions under inquiry indicates a "sharp pattern of dealing." *See Fine*, 89 B.R. at 174. On October 6, 1986, the Bank filed suit in state court; on October 6 and 7, 1986, David sold 1,800 shares of Maverick stock at $44.40 a share to Ted for $79,920.00; on October 14, 1986, debtors were served with summons in the Bank's state court replevin suit. On October 15, 1986, the restructuring began; Maverick's line of credit with Omaha State Bank was increased from $200,000 to $600,000 and David voluntarily pledged his 4,950 shares of Maverick stock and his other personal assets to Omaha State Bank, even though not asked to do so by the Bank.

On October 24, 1986, a Maverick check signed by David was made payable to Ted Armstrong's Omaha State Bank account 06–829–2 for $157,700.00. The same day a cashier's check from Ted Armstrong, drawn on account 06–829–2 was made payable to David for $157,700.00. Also on October 24, 1986, David applied for an annuity in the amount of $158,770.00 and Hannah applied for an annuity in the amount of $78,850.00. On October 28, 1986, a warranty deed was given to Ted Armstrong for debtors' residence.

Generally, when the transfer of assets occurs as a creditor is about to force payment of an obligation, courts have denied discharge. *Oberst*, 91 B.R. at 99. The evidence demonstrates that debtors here have made a concerted effort to remove assets from the reach of the Bank of Hemingford. Omaha State Bank has, as a result of the restructuring, a secured interest in all of debtors' major assets. Debtors no longer have any major unencumbered assets.

The Court finds that there is sufficient extrinsic evidence of intent to hinder, delay, or defraud a creditor to support denial of discharge under 11 U.S.C. § 727(a)(2). Therefore, the objection to discharge is sustained. Separate journal entry shall issue.