931 F.2d 1233
 21 Bankr.Ct.Dec. 1262, Bankr. L. Rep. P 73,927
 In the Matter of David & Hannah ARMSTRONG, Debtors.
The ABBOTT BANK-HEMINGFORD, formerly known as the Bank of
Hemingford, Appellant,
v.
David and Hannah ARMSTRONG, Appellees.
In the Matter of David & Hannah ARMSTRONG.
David ARMSTRONG, Hannah Armstrong, Appellants,
v.
BANK OF HEMINGFORD, Appellee.
In the Matter of David & Hannah ARMSTRONG.
David ARMSTRONG, Appellant,
Hannah Armstrong,
v.
BANK OF HEMINGFORD, Appellee.
 Nos. 89-3075, 90-1042, 90-1043.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 13, 1990.
Decided April 24, 1991.
Rehearing and Rehearing En Banc
in No. 89-3075 denied
May 30, 1991.
 Rehearing Denied in No. 90-1042
June 10, 1991.
 
 Michael G. Helms, Omaha, Neb., for appellants.
 Douglas E. Quinn, Omaha, Neb., for appellees.
 Before JOHN R. GIBSON, Circuit Judge, HEANEY, Senior Circuit Judge, and LARSON,* Senior District Judge.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 This case involves consolidated appeals from two rulings in the bankruptcy case of David and Hannah Armstrong, husband and wife. The Abbott Bank-Hemingford (formerly known as the Bank of Hemingford), a creditor, appeals from an order of the district court[1] affirming a bankruptcy court[2] order allowing the Armstrongs to claim as exemptions under 11 U.S.C. Sec. 522 (1988) certain annuities purchased with proceeds from the sale of their home and stocks. Abbott Bank-Hemingford v. Armstrong, No. 89-0-82 (D.Neb. Nov. 27, 1989), aff'g, In re Armstrong, 93 B.R. 197 (Bankr.D.Neb.1988). The Armstrongs appeal from a district court order of the same date denying them discharge under 11 U.S.C. Sec. 727(a)(2)(A) (1988) on the ground that they transferred property within a year before filing bankruptcy with intent to hinder, defraud, or delay their creditors. Bank of Hemingford v. Armstrong, No. 89-0-292 (D.Neb. November 27, 1989), aff'g, In re Armstrong, 97 B.R. 565 (Bankr.D.Neb.1989). On appeal, the Armstrongs argue that there was no evidence of transfers for the purpose of hindering, delaying, or defrauding creditors. The Bank, on the other hand, argues that the Armstrongs defrauded their creditors by using nonexempt property to buy exempt annuities, and that the exemptions should therefore be denied. We affirm both the exemption and discharge orders.
 
 I.
 
 2
 David and Hannah Armstrong were engaged in farming and filed for Chapter 11 protection on December 31, 1986, later converting voluntarily to Chapter 7.
 
 
 3
 David and his father, Theodore Armstrong, were the sole shareholders in a corporation called Maverick Land & Cattle Company. Until 1986, David had owned 67.25 percent of the Maverick stock and Theodore had owned 32.75 percent. Id. Since the time of Maverick's incorporation, Theodore had lent it money for its operating expenses. By the beginning of 1986, he personally had borrowed $225,000 from a bank in Florida, which he lent to Maverick. Theodore had lent other money to Maverick as well. Maverick also had a line of credit with Omaha State Bank, which was secured by securities Theodore had pledged. Neither Theodore nor David was personally liable for the Omaha State Bank loan.
 
 
 4
 Theodore testified that sometime around July 1986 he learned that David and Hannah were in financial trouble. In fact, they had substantial loans from the Federal Land Bank and the Bank of Hemingford, which they were unable to repay and for which they were trying to negotiate a settlement. Their financial statement, prepared as of March 31, 1986, showed their net worth as negative $333,201.14. Correspondence in evidence indicates that by September 1986, negotiations with the Bank of Hemingford were at a stalemate. The Bank of Hemingford's loan was undersecured and it was apparently relying on David's Maverick stock and David and Hannah's house in Alliance as the unencumbered property from which the loan would be satisfied.
 
 
 5
 In October 1986, David and Theodore embarked on a series of transactions that, taken together, had the effect of: protecting Theodore from liability for Maverick's indebtedness; giving David and Hannah cash to invest in exempt property; selling or encumbering much of David and Hannah's unencumbered property; and improving Omaha State Bank's position to the detriment of the Bank of Hemingford.
 
 
 6
 First, on October 7, 1986, Theodore purchased 1800 shares of David's Maverick stock for $79,920, making Theodore the majority shareholder. Then, on October 15, 1986, Theodore arranged for Omaha State Bank to increase Maverick's line of credit from $200,000 to $600,000. To do this, he pledged securities worth more than $600,000, which were the collateral the Omaha State Bank requested. Next, Maverick used about $228,000 of the new money from the Omaha State Bank loan to pay off Theodore for the money he had provided by borrowing from the bank in Florida. Maverick also repaid Theodore an additional $157,700, which Theodore immediately used to buy David and Hannah's house for that same amount.
 
 
 7
 Notwithstanding his new status as a minority shareholder, David hypothecated his remaining Maverick stock to the Omaha State Bank to secure Maverick's new loan. Although the Bank did not ask them to do so, David and Hannah also voluntarily encumbered a number of vehicles and other stock as security for the Maverick loan.[3]
 
 
 8
 The Chairman of the Board of Omaha State Bank, Marvin Schmid, was a friend of Theodore Armstrong's and Schmid's law firm has represented Theodore, David and Hannah in these proceedings.
 
 
 9
 David and Hannah immediately took the proceeds from the sale of their house and stock and used that cash to purchase annuities, which were exempt from execution under Nebraska law.[4] See Neb.Rev.Stat. Sec. 44-371 (Reissue 1984).
 
 
 10
 The Bank of Hemingford filed suit against the Armstrongs on their debt on October 7, 1986, and service of process took place on October 14, 1986.
 
 
 11
 The net result of all these transactions was that David and Hannah's estate lost the property the Bank was relying on to pay off its loan. Consequently, the Bank moved the bankruptcy court to disallow the exemption for the annuities on the grounds that the Armstrongs had come to own them as a result of a fraudulent transfer or that the transaction showed "extrinsic evidence of fraud." The bankruptcy court held that denial of the exemption was not the proper remedy for the acts the Bank complained of. 93 B.R. at 201. The bankruptcy court stated that the Bank's real grievances had to do with alleged fraudulent conveyances of David's Maverick stock and David and Hannah's house, not with their investment of the proceeds of those conveyances in exempt property. Id. The bankruptcy court explained that conversion of nonexempt property to exempt property on the eve of bankruptcy is not a ground for setting aside the exemption unless there is "extrinsic evidence of fraud." See Hanson v. First Nat'l Bank, 848 F.2d 866, 868 (8th Cir.1988); Norwest Bank Nebraska, N.A. v. Tveten, 848 F.2d 871, 876 (8th Cir.1988); Panuska v. Johnson, 880 F.2d 78, 82 (8th Cir.1989) (explaining Hanson and Tveten ). The bankruptcy court refused to conflate the purchase of the exempt annuities with the other wheelings and dealings going on at the same time, though it invited the Bank to pursue other remedies for these other transactions. 93 B.R. at 203.
 
 The bankruptcy court concluded:
 
 12
 Since conversion of non-exempt assets to exempt assets is not prohibited by federal law unless there is extrinsic evidence of fraud, and since this case was tried on the theory that the sales were fraudulent so the exemption is invalid, and since the Nebraska Legislature has taken advantage of the opportunity afforded it by Congress to opt out of the federal exemption scheme, this Court does not find that the debtors' activities exhibit "extrinsic evidence of fraud" which might require a denial of exemptions.
 
 
 13
 Id. The district court affirmed the exemption order.
 
 
 14
 The Bank then moved to deny the Armstrongs their discharge in bankruptcy on the ground that they had transferred property with the intent to hinder, delay, or defraud their creditors.[5] Since it was not disputed that transfers of the debtors' property had occurred within the year before they filed for bankruptcy, the question before the court was whether the debtors had acted with the intent to hinder, delay, or defraud their creditors.
 
 
 15
 Taking into account the Armstrongs' poor financial condition at the time of the transactions in issue here; the benefits of these transactions to David and Hannah, Theodore, and the Omaha State Bank; and the detriment to the estate; the bankruptcy court found that the debtors had acted with intent to hinder, delay, or defraud their creditors. 97 B.R. at 569. The district court affirmed.
 
 
 16
 The parties all assume that the district court's orders rejecting the claim of fraud on the exemption issue and finding fraud on the discharge issue are inconsistent, and that one of the two orders must be reversed. This does not follow.[6] As discussed below, the inquiry on the exemption claim was limited to whether the transactions resulting in the exemptions were tainted with extrinsic evidence of fraud. The inquiry on the discharge claim was broader and took in facts not relevant to the exemption claim. This disparity in the scope of the two inquiries explains the differing results in the two orders and enables us to affirm both.
 
 II.
 
 17
 On appeal, the Bank argues that the courts below should have denied the annuities exemptions on the ground that the record showed extrinsic evidence of fraud.
 
 
 18
 The question of whether the debtor acted with intent to defraud in converting nonexempt property into exempt property is a question of fact, on which the bankruptcy court's finding will not be disturbed unless clearly erroneous. Hanson, 848 F.2d at 868.
 
 
 19
 The sort of indicia of fraud necessary to find fraudulent use of an exemption would be, inter alia, conduct intentionally designed to materially mislead or deceive creditors about the debtors' position, see Johnson, 880 F.2d at 82, or use of credit to buy exempt property. See Hanson, 848 F.2d at 869. These factors do not exist in this case.
 
 
 20
 Converting a very great amount of property could also be an indication of fraud under Tveten. See Johnson, 880 F.2d at 82 (explaining Tveten ). However, the bankruptcy court's finding of fraudulent intent (or none) is crucial under the Tveten approach. 848 F.2d at 876; see Federal Sav. & Loan Ins. Corp. v. Holt, 894 F.2d 1005, 1009 (8th Cir.1989); Hanson, 848 F.2d at 870-71 (Arnold, J., concurring) (under Hanson and Tveten, existence of fraudulent intent depends on whether the bankruptcy court found the amount of money exempted to be "too much.") In this case, unlike Tveten, there was a lower court finding that the exemption had not been used fraudulently. 93 B.R. at 203.
 
 
 21
 The existence of conveyances for less than adequate consideration has also been stated to be a consideration in adjudging fraudulent use of exemptions. Johnson, 880 F.2d at 82. However, we need not decide whether the Armstrongs' stock and house sales were sufficiently related to their use of the sale proceeds to buy annuities to taint the annuity transaction with fraud, cf. McCormick v. Security State Bank, 822 F.2d 806 (8th Cir.1987), for the Bank produced no evidence that Theodore's purchase of the stock and the house were for less than fair market value.
 
 
 22
 The uncontradicted evidence was that the house was sold at the appraised value. The Bank argues that David hired the appraiser and that the appraisal value is therefore suspect. However, in the absence of any evidence from the Bank of the house's value, we can only conclude that the Armstrongs sold their house for its market value.[7] The Bank argues that there is evidence that Hannah and David Armstrong lived in the house rent-free after the sale, but if Theodore paid them adequate consideration for the house, it is not fraudulent for him to let them live there.
 
 
 23
 The stock price was based on Theodore and David's evaluation of Maverick's assets. The Bank argues that an earlier financial statement of Maverick's showed a higher value for the stock, but there was evidence that Maverick was losing money between the date of the financial statement and the sale. Again, the Bank did not offer any competing evidence as to a different value for the stock at the time of the sale.
 
 
 24
 Therefore, we cannot say that the bankruptcy court clearly erred in finding that the exemption transactions were free from "extrinsic evidence of fraud."
 
 
 25
 The Bank also argues that the bankruptcy court erred as a matter of law in holding that under Nebraska law property may be exempt even though the debtor purchased it precisely for the purpose of taking advantage of the statutory exemptions. The Bank argues that enactment of the Uniform Fraudulent Conveyance Act, Neb.Rev.Stat. Secs. 36-601--36-613 (Reissue 1988), repealed by 1989 Neb.Laws 423 Sec. 13, effectively overruled earlier Nebraska case law, which held that it was permissible to use nonexempt assets to buy exempt property strictly to enjoy the protection of the exemption statutes. See Paxton v. Sutton, 53 Neb. 81, 73 N.W. 221, 223 (1897). The Bank argues that the Uniform Fraudulent Conveyance Act defines as fraudulent: "Every conveyance made ... with actual intent ... to hinder, delay, or defraud ... creditors ..." Neb.Rev.Stat. Sec. 36-607. This definition, the Bank says, includes conversion of nonexempt to exempt property for the purpose of sheltering it from creditors.
 
 
 26
 The Bank's argument begs the question. If a type of transfer is legitimate under established state law, the intent to effect such a transfer is merely the intent to exercise a valid right rather than an intent to defraud. This point was made in our early case, Forsberg v. Security State Bank, 15 F.2d 499 (8th Cir.1926) (discharge case), in which we said: "[T]he transfer of property in the instant case, being but a step in the conversion of nonexempt assets ... did not constitute a transfer of the bankrupt's property with intent to hinder, delay, or defraud creditors ..." Id. at 502. As Judge Arnold recently pointed out in his Tveten dissent, some perfectly legitimate actions may "delay or hinder creditors ... in the ordinary, non-legal sense," but these legitimate acts are not the sort of hindrances covered by this statutory language. 848 F.2d at 877 (discussing same language in the bankruptcy code).
 
 III.
 
 27
 Hannah and David argue that the bankruptcy court erred in denying them discharge on the ground that they transferred their property with intent to hinder, delay, or defraud their creditors. Again, the bankruptcy court's finding of intent is subject only to the clearly erroneous standard of review. Tveten, 848 F.2d at 874.
 
 
 28
 The debtors argue that they are being denied discharge for the same conversion of property to exempt assets that was earlier held permissible in the exemption order. That would indeed have been inconsistent. See Tveten, 848 F.2d at 874 ("the standard applied consistently ... [in determining whether discharge should be granted] is the same as that used to determine whether an exemption is permissible"). However, the bankruptcy court made clear that the entire course of the Armstrongs' October 1986 transactions was included in the discharge inquiry, while the facts scrutinized in the exemption inquiry were far more limited.
 
 
 29
 Fraudulent intent is presumed in section 727(a)(2) cases in which the debtor has gratuitously conveyed valuable property. City Nat'l Bank v. Bateman, 646 F.2d 1220, 1222 (8th Cir.1981) (under predecessor statute to section 727(a)(2)). Once gratuitous transfer is shown, the burden then shifts to the debtor to prove his intent was not to hinder, delay, or defraud his creditors. Id.
 
 
 30
 In this case, David and Hannah, who were not liable on the indebtedness of Maverick, pledged unencumbered property to secure Maverick's loan. Not only did the Omaha State Bank not request this, but actually tried to warn them off from doing so. They did this at a time when they were insolvent and when David had just become a minority shareholder. Hannah signed over property, though she was not even a Maverick shareholder. Moreover, the result of this encumbrance was to benefit Theodore, who in turn was using the transaction to generate cash that the debtors then used to convert their nonexempt property into exempt property.
 
 
 31
 The debtors attempt to justify their actions by saying that Theodore requested them. Given the cumulative effect of the transactions, there is no basis for crediting this as an arms-length transaction. The efforts of both father and son were clearly directed toward protecting each other's positions to the detriment of the Bank of Hemingford. They were represented by the same law firm in the transaction, and that firm happened to include the Chairman of the Board of the Omaha State Bank, which benefited from the pledge.
 
 
 32
 The debtors' transfer of property to Omaha State Bank was not mere preference of one creditor over the other. They were not personally liable on the Omaha State Bank loan, and their undertaking while insolvent and expecting to be sued any day had the effect of depleting their estate to the benefit of their father, who was not their creditor.
 
 
 33
 Accordingly, we affirm the denial of discharge and the order granting the exemptions.
 
 
 
 *
 The Honorable Earl R. Larson, Senior United States District Judge for the District of Minnesota, sitting by designation
 
 
 [1]
 The Honorable Lyle E. Strom, Chief Judge, United States District Court for the District of Nebraska
 
 
 [2]
 The Honorable Timothy J. Mahoney, Chief Judge, United States Bankruptcy Court for the District of Nebraska
 
 
 [3]
 David argues that this stock was already encumbered. There is a letter in evidence dated October 16, 1986, from Theodore indicating that he held a lien on David's Maverick stock, which he subordinated to the Omaha State Bank. However, there is no evidence of when Theodore obtained the lien or for what consideration, and there is correspondence in evidence indicating that as of October 3, 1986, the Bank of Hemingford had been led to believe that the stock was unencumbered
 
 
 [4]
 Nebraska law was subsequently amended to limit the value of annuity that is exempt to $10,000. Neb.Rev.Stat. Sec. 44-371 (Reissue 1988)
 
 
 [5]
 11 U.S.C. Sec. 727(a)(2)(A) (1988) provides:
 (a) The court shall grant the debtor a discharge, unless-- ...
 (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed--
 (A) property of the debtor, within one year before the date of the filing of the petition....
 
 
 [6]
 While the propriety of exemptions is tested both under state and federal law, 3 L. King, Collier on Bankruptcy Sec. 522.08 n.b & nn. 18-19 (1990), and the right to discharge is decided under federal law alone, see Tveten, 848 F.2d at 874, this distinction is not determinative in this case
 
 
 [7]
 It is interesting that the Armstrongs' financial statements as of March 31, 1986, carried the house at only $100,000. David testified that the Bank prepared the figures in those statements. The Bank denied this